UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY DANIEL ZELIN,

                         Plaintiff,            Civil Action No. 14-12845
                                               Honorable Arthur J. Tarnow
           v.                         Magistrate Judge David R. Grand

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                         Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [15, 17]**

Plaintiff Timothy D. Zelin ("Zelin") brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions, which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). [4].

**I.     RECOMMENDATION**

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Zelin is not disabled under the Act. Accordingly, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [17] be GRANTED, Zelin's motion [15] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

## II.    REPORT

### A.    Procedural History

On October 20, 2011, Zelin filed an application for DIB and SSI, alleging an onset date of June 1, 2008. [Tr. 174; 180].[1] This application was denied. [Tr. 93]. Zelin filed a request for an administrative hearing, which was held on February 22, 2013, before ALJ Michael R. Dunn. [Tr. 38-80]. Zelin, who was represented at the hearing by attorney Bethany G. Versical,[2] testified, as did vocational expert Lois Brooks. [*Id*.]. On March 14, 2013, the ALJ issued a written decision finding that Zelin was not disabled. [Tr. 17-34]. On May 19, 2014, the Appeals Council denied review. [Tr. 1-3]. Zelin filed for judicial review of the final decision on July 21, 2014. [1].

### B.    Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

---

[1] At the hearing before the ALJ, Zelin' counsel amended the alleged onset date from June 1, 2008 to February 19, 2010. [Tr. 22, 42-43].

[2] On appeal, Zelin is represented by attorney Diane M. Kwitoski. [15 at 22].

2

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

## C.   Background

### 1.   *Zelin's Subjective Reports and Testimony*

In an undated disability report, Zelin asserted that the conditions rendering him disabled were as follows: back injury, scoliosis, arthritis of the spine, split disc in lower spine, arthritis, nerve damage, depression, severe anxiety, fatigue, memory loss, and a history of head injuries. [Tr. 213].  Prior to stopping work, Zelin worked as a laborer, Navy Seaman Apprentice, and driller.  [Tr. 105].  Zelin was 30 years old as of his amended alleged onset date.  [Tr. 82].

Zelin completed a function report dated November 30, 2011.  [Tr. 204-211].  In that report, he complained of "tingling and numbness down my legs" and "severe pain in my lower spine" such that he is required to "lie down throughout the day."  [Tr. 204].  He reported discomfort "much of the time" that "affects my concentration and ability to think."  [*Id*.].  He

3

also reported experiencing fatigue, memory loss, and depression, which he attributed to several car accidents and head injuries. [*Id.*].

With regard to his activities of daily living, Zelin stated that he has trouble sleeping and is consequently too fatigued to engage in many activities. [Tr. 205]. While he assists in taking care of his children, Zelin stated that he is "not able to [do] any chores completely or to the level that I was able to before . . . . It is difficult to bend, lift, move around like I used to." [Tr. 204, 206]. He stated that "for the most part, I stay inside and isolate myself," and that he "lost interest in a lot of things because of my depression." [Tr. 207-08].

Zelin reported that he drives or rides in a car when going out, and is able to go out alone. [Tr. 207]. However, he indicated that driving is sometimes painful because of "[t]ingling and numbness down my legs from the nerve damage," and drives "when I absolutely have to and have no one to take me." [*Id.*]. Zelin also stated that he is able to manage his monetary affairs, but "because of my memory difficulties, I will sometimes lose track of bills, lose track of things I need to do to manage money." [*Id.*].

Regarding self-care, Zelin noted difficulty getting dressed and using the toilet because of back and knee pain. [*Id.*]. He also reported that he requires reminders to take care of personal grooming "sometimes," and generally requires reminders to take his medicine or go places. [Tr. 206, 208]. He reported cooking only simple meals because his pain makes it "very difficult to stand for even ten minutes at a time just to make food," and stated that he takes breaks to lie down while cooking. [*Id.*].

Regarding his social interactions, Zelin reported that he mostly interacts with his children, "tend[s] to isolate" himself, and rarely socializes outside of his family. [Tr. 208]. Zelin asserted that he does not regularly go outside except for doctor's appointments. [*Id.*]. Zelin

noted that he is "not as social or happy" as he once was, but did not have "big problems" getting along with others. [Tr. 209]. He also reported difficulty handling stress and "high anxiety," along with experiencing "paranoia and panic attacks more than I used to." [Tr. 210].

Zelin reported that his injuries negatively impacted his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb, complete tasks, memorize, concentrate, and understand, but did not impact his ability to use his hands, follow instructions, or get along with others. [Tr. 209].

At the February 22, 2013 hearing before the ALJ, Zelin testified that while working as a driller, he regularly lifted weights greater than 100 pounds. [Tr. 48]. During his work as a laborer, Zelin regularly lifted shovels full of dirt and bags of dirt. [Tr. 49].

Zelin testified that he suffers from disabling pain in his lower and upper back, arthritic pain in his right hand, and pain and numbness in his right thigh. [Tr. 51-52]. He recounted taking the anti-inflammatory drug Naproxen, Neurontin for nerve damage, Vicodin for pain, Klonopin and Prozac to treat anxiety, and Seroquel to assist in sleeping. [Tr. 54-55]. Zelin stated that his pain medication "did not cure everything" but made his leg pain "a little more bearable." [Tr. 55]. He testified that physical therapy provided good results, but complained of neck and lower back pain from certain exercises. [Tr. 56-57].

Zelin testified that he could walk about a block before knee pain forced him to stop, and could sit for approximately 30 to 60 minutes before his back pain causes him to change position. [Tr. 60]. He said he was most comfortable lying flat on carpet with his knees in the air, which he does two or three times daily. [Tr. 70]. Zelin wrote that he could pour a gallon of milk with his left hand, but would experience pain if he attempted to do so with his right hand. [Tr. 61]. However, he retained the ability to open doorknobs with his right hand. [Tr. 72]. He also stated that he could lift a 20 pound sack if he could support himself properly, but could not repeatedly

5

lift such weight.  [Tr. 61].  He testified that he experienced some difficulty in lifting up his five

year old son.  [Tr. 72].  Zelin said he is able to care for himself, cook simple meals, and do

laundry.  [Tr. 63].  He also recounted that he is able to go shopping, but rides a scooter for long

shopping trips.  [Tr. 63-64].

Zelin testified about memory and concentration problems, including problems "trying to

control what I'm thinking about."  [Tr. 69].  With regard to social interactions, Zelin recounted

getting along well "with the few people I know," but said that interacting with unfamiliar persons

"scares me because, I don't – you know, again, the self-control, I don't know what . . . could

happen."  [Tr. 62].  He said he experiences irritability and racing thoughts as a result of pain.

[*Id*.].  Zelin described his depression as manifesting in feelings of being "worthless," and

reported spending an excessive amount of time in his basement "isolating myself like a hermit,"

where he does little but play solitaire.  [Tr. 67-68].  Zelin stated that he has "heard voices"

speaking to him, and occasionally believes that his children are calling for him when they are in

fact asleep, though he characterized this experience as "nothing delusional."  [Tr. 68].  He also

recounted hearing his deceased brother's voice after staying awake for three days, and stated that

the loss of his brother in 2006 "bothers me a lot still to this day."  [Tr. 68-69].  Zelin said he gets

approximately four hours of uninterrupted sleep nightly when taking Seroquel.  [Tr. 69].  With

regard to substance use, Zelin stated that he abstained from alcohol for "almost a year" as of the

hearing, but occasionally used marijuana.  [Tr. 57-58].

### 2.    *Medical Evidence*

Zelin does not take direct issue with the ALJ's evaluation of the medical evidence in this

case.  Further, the Court has reviewed the entire record, and will discuss the relevant portions of

that record within the analysis portion of this Report and Recommendation.

### 3.   Vocational Expert's Testimony

The VE characterized Zelin's past work as a driller as skilled, and performed at a heavy level of exertion; and his work as a laborer as unskilled, and performed at a medium level of exertion.  [Tr. 74].  The ALJ asked the VE to imagine a claimant of Zelin's age, education, and work experience in a series of hypothetical questions.  First, the ALJ inquired as to the jobs available to such a hypothetical person who could perform work at a light level of exertion; but who could not lift more than five pounds independently with the right upper extremity; who could stand, sit, or walk for six hours in an eight hour workday; and who could frequently climb ramps and stairs, occasionally climb ladders and scaffolds, frequently balance, occasionally stoop, crouch or kneel; who could not crawl; who should not be exposed to unprotected heights or hazardous machinery; should not drive commercially; and who would be limited to simple, routine, and repetitive tasks performed at Specific Vocational Preparation ("SVP")[3] of 1 or 2 as defined in the Dictionary of Occupational Titles; and would not be required to meet fast-paced production requirements, with few workplace changes, and simple work-related decisions; who is limited to occasional interaction with supervisors and coworkers, with no tandem tasks, and no interaction with the public.  [Tr. 75-76].  Based on those restrictions, the VE found that the hypothetical worker could not perform any of Zelin's prior work, but could perform work as an unskilled packager (6,500 jobs in Southeast Michigan), laundry laborer (1,800 jobs), and a cleaner (8,000 jobs).  [*Id.*].

The ALJ then posed a more restrictive hypothetical, including all of the prior restrictions

---

[3] The Dictionary of Occupational Titles (DOT) lists a specific vocational preparation (SVP) time for each described occupation.  For instance, using the skill level definitions in 20 C.F.R. § 404.1568 and § 416.968, unskilled work corresponds to an SVP of 1–2; semi-skilled work corresponds to an SVP of 3–4; and skilled work corresponds to an SVP of 5–9.  *See Soc. Sec. Rul*. 00–4p, 2000 WL 1898704, at *3 (Dec. 4, 2000).

and adding limits to occasional grasping or fingering with the upper right extremity, and a sit/stand option every half-hour. [Tr. 76-77]. The VE testified that a worker with such limitations would be able to perform a reduced number of jobs as a packager (2,500 jobs in Southeast Michigan) or laundry laborer (900 jobs). [Tr. 77-78].

The ALJ's third hypothetical added that the worker would require frequent position changes, suffer from the distracting effects of pain, sleepiness as a result of medication during part of the day, and would be off task 20 percent of the day in addition to regularly scheduled breaks. [Tr. 77]. The VE testified that such restrictions would preclude all competitive employment. [*Id.*]. The ALJ also inquired whether three or four absences per month, when combined with any of the prior hypotheticals, would preclude competitive employment; the VE confirmed that it would. [*Id.*].

### D.   The ALJ's Findings

Following the five-step sequential analysis, the ALJ found Zelin not disabled under the Act. At Step One, the ALJ found that Zelin had not engaged in substantial gainful activity since February 19, 2010, the alleged onset date. [Tr. 22]. At Step Two, the ALJ found that Zelin had the following severe impairments: degenerative disc disease of the lumbar spine, degenerative joint disease of the right wrist, major depressive disorder, and anxiety disorder. [Tr. 23]. At Step Three, the ALJ found that Zelin does not have an impairment or combination of impairments that met or medically equaled a listed impairment. [Tr. 23-25].

Next, the ALJ assessed Zelin's residual functional capacity ("RFC"), finding him capable of light work as defined in 20 CFR 404.1567(b), except:

> The claimant can lift 20 pounds occasionally and 10 pounds frequently . . . is unable to lift more than 5 pounds independently with the right upper extremity . . . can sit for a total of 6 hours in an 8-hour workday and stand or walk for a total of 6 hours in an 8-hour workday . . . requires a sit/stand

> option every thirty minutes provided the claimant is not off task more than 10% of the workday . . . can occasionally grasp and finger with the right upper extremity . . . is unable to crawl, but can frequently balance and climb ramps and stairs and occasionally stoop, kneel, crouch, and climb ladders and scaffolds . . . should avoid all unprotected heights, hazardous machinery, and commercial driving . . . requires work that is limited to simple, routine, repetitive unskilled tasks performed at svp 1 or 2 as defined in the Dictionary of Occupational Titles, free of fast-paced production requirements with few, if any, work place changes and with only simple work related decisions required . . . and requires work that involves only occasional interaction with supervisors and coworkers with no tandem tasks and no interaction with the public.

[Tr. 25]. At Step Four the ALJ concluded that Zelin is unable to perform his past relevant work. [Tr. 33]. At Step Five, the ALJ concluded, based in part on VE testimony, that Zelin is capable of performing a significant number of jobs that exist in the national economy. [Tr. 33]. As a result, the ALJ concluded that Zelin is not disabled under the Act. [Tr. 34].

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)

9

(internal quotations omitted).   In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."   *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.   *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.   *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).   There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal quotations omitted).   If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.   Analysis

Zelin argues that the ALJ erred by failing to follow the treating physician rule, and by inappropriately giving great weight to some portions of the consultative physicians' opinions while giving limited weight to others.   [15 at 13-21].   The Court addresses these arguments in

turn.

### 1.     The ALJ Did Not Violate the Treating Physician Rule

An ALJ must give a treating physician's opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) quoting 20 C.F.R. § 404.1527(d)(2). If an ALJ declines to give a treating physician's opinion controlling weight, he must then determine how much weight to give the opinion, "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) citing *Wilson*, 378 F.3d at 544; see also 20 C.F.R. § 404.1527(d)(2). "The ALJ is not required to explain how he considered each of these factors, but must nonetheless give 'good reasons' for rejecting or discounting a treating physician's opinion." *Shrum v. Comm'r of Soc. Sec.*, No. 10-13795, 2011 WL 6014456, at *4 (E.D. Mich. Nov. 30, 2011) citing *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011). Such good reasons must be supported by substantial evidence in the record, and "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson*, 378 F.3d at 545 (6th Cir. 2004) (quoting SSR 96–2p). An ALJ is not required to give any special weight to a treating source's conclusion that a claimant is disabled, as this conclusion is reserved to the Commissioner alone, based on all the evidence of record. 20 C.F.R. § 404.1527(e)(1), (e)(3).

a. *The ALJ did not Err by Giving Limited Weight to Dr. Chapman's Mental RFC Assessment*

On January 2, 2013, treating psychiatrist Dr. Timothy Chapman drafted a mental RFC assessment in which he found that Zelin was moderately or markedly limited in most areas of mental functioning.[4]  [Tr. 392-93].   The ALJ accorded "limited weight" to Dr. Chapman's findings because he found that they were "not supported by his clinical findings regarding [Zelin's] mental status."  [Tr. 30].   The ALJ noted that "examination findings indicated the claimant improved with treatment and had been was [sic] relatively stable over the past year with treatment."  [*Id.*].   The ALJ also noted that Dr. Chapman's finding of marked limitations was inconsistent with the global assessment functioning ("GAF")[5] score he assessed at 51, which indicates moderate limitations or symptoms.  [*Id.*].   The ALJ also noted that Dr. Chapman recorded Zelin was "doing well" and was "developing coping skills for stress, anger, and depressive feelings."  [*Id.*].   Finally, he found that Dr. Chapman's assessment was a "check-the-box medical questionnaire" which "failed to provide any explanation for the checked responses in the form of a narrative."  [*Id.*].

Zelin argues that the ALJ erred by giving limited weight to Dr. Chapman's mental RFC assessment for several reasons.   First, Zelin argues that Dr. Chapman's mental RFC assessment should not be rejected by reason of being non-narrative, because the assessments prepared by Dr. Bray and Dr. Morrow suffer from the same failings.  [15 at 14].   Second, he argues that Dr. Chapman's treatment notes do in fact support his RFC assessment.  [*Id.* at 15].   Third, he asserts

---

[4] While portions of Dr. Chapman's mental RFC are illegible, it is clear that Dr. Chapman found Zelin was markedly limited in terms of his ability to understand and remember detailed instructions, to carry out detailed instructions, in certain facets of concentration, persistence, or pace ("CPP"), several areas of social interaction, and some areas of adaptation.  [Tr. 392-93].

[5] "GAF is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning."  *Kornecky*, 167 F. App'x 496, 503 (6th Cir. 2006).

12

that the GAF score assigned by Dr. Chapman does not contradict his RFC assessment, and that the GAF score is not indicative of his mental health if he was subjected to the rigors of competitive employment.   [*Id*. at 16-17].   As discussed below, the record shows Zelin's arguments to lack merit, and that the ALJ's reasoning is sound.

Zelin first sought mental health treatment from Community Care Services on November 15, 2011.  [Tr. 295].  He asserted that he was seeking help for "anxiety and depression" because he felt that he did not have "any emotions left."  [*Id*.].  He reported no thoughts of suicide, but had racing thoughts, pain which made sleep difficult, and low appetite.  [*Id*.].  On December 12, 2011, Zelin complained to a consulting psychiatrist that he was "too stressed and worked up," had not slept for three nights, and said that he "heard inverted whispering voices of his brother." [Tr. 286].  A check box form completed on that date records that he was anxious and had hallucinations, but was cooperative, had good eye contact, and appropriate mood.  [Tr. 289]. The consulting psychiatrist prescribed Prozac and Seroquel to treat his sleep and anxiety issues. [Tr. 292].

Zelin began treating with Dr. Chapman on January 12, 2012, at which point he reported "some improvement in symptoms," but continued to have anxiety.  [Tr. 275].  On February 16, 2012, Dr. Chapman found that Zelin was "doing better with the medication," was "seeing a therapist monthly and feels it is going well," and had "[n]o perceptual disturbances."  [Tr. 269]. His attitude was pleasant and cooperative, and his speech, mood, affect, perception, thought processes, and insight were found to be normal.  [*Id*.].  On June 7, 2012, Dr. Chapman recorded that Zelin was "doing well" with his medications, his appetite and sleep had improved, and while he felt "depressed at times," he experienced no psychotic symptoms.  [Tr. 382].  On August 2, 2012, Dr. Chapman recorded that Zelin's mood, affect, and other mental faculties were generally

13

normal, and again found that Zelin was "doing well" with his medication, but suffered from chronic pain. [Tr. 372-73]. On September 27, 2012, Dr. Chapman again found generally normal mental health, with "no sign of perceptual disturbances." [Tr. 367].

On November 29, 2012, Dr. Chapman found that Zelin had "been relatively stable with med[ication]s for the past year and fe[lt] his children help[ed] him to stay calm." [Tr. 341]. However, Zelin reported being "more irritable and only sleeping 2-3 hours a day for the past few months," though Dr. Chapman noted that Zelin "did not mention it until today." [Id.]. Zelin also mentioned "finding himself closer to getting into altercations because of his irritability." [Id.].[6]

Consultative physicians Dr. Hugh Bray and Dr. Kathy Morrow also produced RFC assessments of Zelin's mental condition. Dr. Morrow found that Zelin was moderately limited in his ability to carry out detailed instructions, maintain concentration and attention for extended periods, and sustain an ordinary routine without special supervision. [Tr. 104]. She found that Zelin was not significantly limited in his ability to carry out very short and simple instructions, keep a schedule and be punctual, work in proximity to others, make simple work-related decisions, or complete a normal workday. [Id.]. She also found that Zelin did not have understanding or memory limitations, social interaction limitations, adaptation limitations, or CPP limitations. [Id.].

Dr. Bray reached similar conclusions. He found that Zelin was mildly impaired in terms of his ability to relate to others, to understand, remember, and carry out tasks, and to maintain attention, CPP, and effort. [Tr. 312]. In terms of his ability to withstand stress and pressure in

---

[6] Dr. Chapman also noted that Zelin reported that he "stays down in the basement sitting in the darkness, and he heard inverted whispering voices of his brother…" [Tr. 341]. Given that the unique phrase "inverted whispering" first appears in notes from Zelin's December 12, 2011 visit, and because Dr. Chapman noted that Zelin was not experiencing hallucinations during his November 29, 2012 visit, this note appears to merely be a restatement of Zelin's earlier complaint. [Tr. 344].

14

work activities, he found Zelin was mildly to moderately impaired.  [*Id.*].

Turning to Zelin's arguments, the Court first notes that he incorrectly asserts that Dr. Bray's mental RFC assessment cannot be distinguished from Dr. Chapman's because both are non-narrative assessments.  Dr. Bray's March 13, 2012 report spans five pages, and includes information on Zelin's reported symptoms, his medical history, interests and aspirations, daily activities, and the results of a series of mental exercises testing his mental functions.  [Tr. 309-13].  Specifically, he was tested with regard to his memory, understanding of basic information about the world, abstract thinking, calculations, judgment, and reasoning.  [Tr. 311-12].  The Court rejects Zelin's assertion that Dr. Bray "simply offered a list of limitations" because the test results and Dr. Bray's other records provide the reader with insight into how he reached his ultimate conclusions regarding Zelin's mental health.  In contrast, Dr. Chapman's report provides no explanation for his mental RFC conclusions, but rather consists solely of checked boxes.  [Tr. 392-93].  The ALJ thus did not err by giving less deference to Dr. Chapman's mental RFC than to Dr. Bray's.  *See Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 471 (6th Cir. 2014) (holding that an ALJ did not err by giving limited weight to a treating physician's unexplained check-box RFC assessment).  While Zelin correctly notes that Dr. Morrow's RFC does not provide narrative details which might help to explain the RFC assessment she ultimately reaches, Dr. Morrow's RFC assessment closely follows Dr. Bray's, which does provide narrative details sufficient to justify preferring that assessment over Dr. Chapman's.

Second, Zelin's assertion that Dr. Chapman's treatment notes support a finding of consistent mental instability is incorrect.  With the exception of his November 29, 2012 visit with Dr. Chapman, Zelin expressed fairly consistent improvement of his sleep, mood, appetite, and emotional stability throughout his treatment.  [*See, e.g.*, Tr. 269 ("States he is doing better

with the medications…Has been seeing therapist monthly and feels it is going well."), 372-73 ("States he is doing well with current meds [sic] sleep is improved…Denies any current psychosis or mood problems."), 382 ("States he is doing well with the current meds.  No psychotic symptoms sleep is improved…")].[7]  While Zelin reported increased irritability and difficulty sleeping to Dr. Chapman on November 29, 2012 [Tr. 341], Dr. Chapman's notes from that date state that Zelin reported having "been relatively stable with meds for the past year and feels his children help him to stay calm."  [Tr. 341].  Moreover, Zelin's complaints on this date are not supported by any objective findings, and this single report of regression does not outweigh nearly a year of reports of improvement.

Nor did the ALJ err by finding that Dr. Chapman's GAF assessment of 51 was inconsistent with his very restrictive mental RFC assessment.  While Zelin is correct that a GAF score indicating moderate limitations does not necessarily preclude the existence of marked limitations in certain areas of mental functioning, the relatively high number of "marked" limitations included in Dr. Chapman's RFC does not appear consistent with his overall assessment of only moderate limitations.  *See Layne v. Comm'r of Soc. Sec.*, No. 08-12552, 2009 WL 2496474, at *3 (E.D. Mich. Aug. 17, 2009) (holding that a "GAF of 51 . . . is inconsistent with a finding of marked difficulty maintaining social functioning or marked difficulty maintaining concentration, persistence or pace.").  Zelin's argument that his GAF score is misleading because it does not capture the distress he would suffer if required to work in competitive employment is speculative and not well supported by the medical evidence of record.  Moreover, the ALJ included restrictions in his RFC finding which accommodate Zelin's

---

[7] During this same general timeframe, Zelin was repeatedly found to be pleasant and cooperative with physicians [Tr. 311; 367, 373], and he reported that he does not have "big problems" getting along with others [Tr. 209], and that he gets along well with coworkers [Tr. 310].

mental impairments, including a restriction to simple, routine, repetitive unskilled tasks; no fast-paced production requirements; limited interaction with supervisors and coworkers; no interaction with the public; few if any workplace changes; and only simple work related decisions. [Tr. 25].

For all of the above reasons, the Court finds that the ALJ gave good reasons for the lesser weight he assigned to Dr. Chapman's mental RFC assessment.

  b.    *The ALJ Did Not Err by Giving Dr. Pinson's Opinion Limited Weight*

On February 20, 2013, Dr. Thomas Pinson of City Medical performed a physical RFC assessment of Zelin. [Tr. 415-17]. Zelin asserts that he was under Dr. Pinson's care for several months at that time. [15 at 6]. However, records from City Medical prior to that visit include reports signed "PS" in the space reserved for a physician's signature. It is thus it is unclear whether these records were produced by Dr. Pinson. [15 at 19, Tr. 394-414]. Notes from September to November 2012 indicate a diagnosis of lumbosacral disc protrusion, anxiety, lumbosacral spine degenerative joint disease, and lumbosacral retrolisthesis. [Tr. 399-403]. Notes from December 2012 indicate a diagnosis of lumbosacral spine degenerative disc disease and anxiety. [Tr. 397]. Notes from January 2013 also include lumbosacral spine degenerative disc disease, anxiety, and right wrist pain. [Tr. 395].

In his physical RFC assessment, Dr. Pinson found that Zelin could, on a sustained basis, sit for less than two hours, and stand or walk for less than one hour. [Tr. 415]. With regard to lifting capacity, Dr. Pinson stated that Zelin could frequently lift up to 10 pounds, could occasionally lift 11 to 20 pounds, but could never lift more than 20 pounds. [*Id*.]. He also found that Zelin could grasp with both hands, but could not push or pull arm controls or perform fine manipulation with his right hand. [*Id*.]. Dr. Pinson stated that Zelin could not use his feet to

17

manipulate leg controls on a sustained basis.  [Tr. 416].  Finally, he recorded that Zelin would need 10 minutes of rest per hour, and would need to lie down for "substantial periods of time" during the day.  [Tr. 417].

The ALJ gave limited weight to Dr. Pinson's opinion ("except for the [portion] regarding [Zelin's] ability to lift or ability to perform repetitive fine manipulation with the right hand/wrist," which impairments the ALJ reasonably accommodated through restrictions in the RFC) because he found that it was "not well supported by the objective evidence and is inconsistent with the other substantial evidence of record."  [Tr. 25, 28].  The ALJ also noted the opinion's inconsistency with the  generally conservative treatment prescribed to treat Zelin's back and leg pain.  [*Id.*].  The ALJ also noted that Dr. Pinson's assessment was "vague and ambiguous" because it was "unclear whether the physician was responding to the length of time [Zelin] could sit or stand at one time or the total number of hours in an 8-hour workday."  [*Id.*]. The Court finds that substantial evidence supports the ALJ's conclusions.

With regard to the alleged vagueness of Dr. Pinson's RFC assessment, Zelin argues that "the form is not ambiguous at all.  It expressly asks for plaintiff's 'full capacity' during an eight-hour workday."  [15 at 20].  The ALJ is correct in his assertion that the language used in Dr. Pinson's form is subject to multiple interpretations.  That form defines a "sustained basis" as "40 hours per week less a reasonable time for lunch and breaks – taking into account the effects, if any, of pain and/or prescribed medication," but then asks the physician how many hours "in an 8-hour workday, patient can, on a sustained basis" sit, stand, and walk.  [Tr. 415] (emphasis in original).  By defining "sustained basis" as an entire 40-hour workweek, but then applying that definition to some portion of an 8-hour workday, the form is ambiguous and subject to at least two interpretations: 1) that it asks for the number of hours which the patient can stand at one time

before taking a break during an eight-hour day, sustained over a forty-hour week; or 2) that it asks for the number of hours which the patient can stand in total during the course of an eight-hour day, sustained over a forty-hour week. This ambiguity is a legitimate reason to give limited weight to Dr. Pinson's physical RFC as it relates to Zelin's ability to stand, walk, and sit on a sustained basis. *See Allen v. Comm'r of Soc. Sec.*, No. 12-11261, 2013 WL 5423728, at *3 (E.D. Mich. Sept. 26, 2013) (finding that ambiguity was a good reason for rejecting a treating physician's opinion).

Zelin also argues that Dr. Pinson's opinion is fully consistent with other medical evidence of record. [15 at 19-21]. However, the ALJ's contrary determination is supported by substantial evidence. On October 13, 2010, an x-ray of Zelin's lumbosacral spine showed "minimal dextroscoliosis," "disc space narrowing at the lumbosacral junction," a "small renal calculus," and "mild degenerative changes . . . in sacroiliac joints on the left side." [Tr. 261]. On February 21, 2011, Dr. Gregory White performed an MRI scan on Zelin at Basha Diagnostics, P.C. [Tr. 259-60]. Dr. White found "no lumbar compression fracture, subluxation, suspicious bone marrow lesion or paraspinal mass. The distal cord and conus are normal. No abnormal cord enhancement." [Tr. 259]. Zelin's T12 through L5 vertebrae were found to be unremarkable, but his L4-L5 vertebrae showed "disc desiccation and decreased disc height" with "mild endplate spondylosis," "minimal facet arthrosis," "central disc protrusion . . . suggesting annular fissure," "mild spinal stenosis," and "mildly narrowed" neural foramina. [Tr. 259]. Dr. White's ultimate impression was of a "L4-L5 central disc protrusion with annular fissure." [*Id.*].

On September 8, 2011, Dr. Melicor interpreted an MRI of Zelin's spine, which he recorded was "grossly negative as seen," and was generally normal. [Tr. 258]. An MRI was again administered at Basha Diagnostics, P.C. on October 9, 2011, which Dr. Ruth Ramsey

found demonstrated a "small area of midline prominence of the disc at C5-6," with "otherwise normal" results and "no pathologic areas of enhancement."  [Tr. 256].

On October 29, 2012, Dr. Brian Herman of Basha Diagnostics, P.C. interpreted yet another MRI of Zelin's spine, finding "normal variant transitional lumbosacral anatomy," "mild degenerative changes at the L4-L5 disc where there is disc desiccation," "mild loss of disc height," "a mild central disc bulge," a "posterior midline annular tear," "spinal canal stenosis and minor narrowing of the inferior aspects of bilateral neural foramina at L4-L5," with the other discs appearing generally normal.  [Tr. 320-21].

Dr. Ramsey again interpreted an MRI of Zelin's spine on April 10, 2013, which she found displayed "a small, focal, midline herniated disc at C5-C6," but with no other "appreciable change[s]" when compared to Zelin's October 9, 2011, study.  [Tr. 418-19].  Taken together, the foregoing constitutes substantial evidence in support of the ALJ's conclusion that Dr. Pinson's opinion "is not well supported by the objective evidence and is inconsistent with the other substantial evidence of record…"  [Tr. 28].

Zelin also notes that Dr. Pinson prescribed "a number of very significant narcotic medications, including Naproxen, Neurontin, and Vicodin . . . [indicating that Dr. Pinson] considered [Zelin's] issues significant."  [15 at 20].   However, treatment with medication constitutes conservative treatment, and the ALJ properly considered this treatment in rendering his decision.  *See Ashworth v. Sullivan*, 951 F.2d 348 (6th Cir. 1991) (holding that treatment of back pain with epidural steroid injections, mild medication, exercise, and a heating pad was conservative, and undercut the claimant's complaints of pain); *Beveridge v. Comm'r of Soc. Sec.*, No. 10-12883, 2011 WL 4407564, at *6 (E.D. Mich. July 18, 2011) (finding that the use of ibuprofen and Neurontin to treat chronic back pain was conservative, and particularly supported

a finding of not-disabled where the claimant reported that such treatment provided some relief). Nothing in the record suggests that Zelin's back, leg, or hand ailments were severe enough to merit surgical intervention, nor that Zelin sought out, or Zelin's doctors recommended, any additional pain reduction measures. Zelin reported that his medication rendered his leg pain "more bearable" [Tr. 55], and that he was "doing well" with his medication [Tr. 372-373].

The ALJ also properly noted that Zelin's medical reports do not support his assertions of severe and disabling pain, particularly in that "the record does not demonstrate [a] significantly limited range of motion, motor weakness, sensation loss, reflex abnormalities, or neurological deficits that are associated with intense and disabling pain." [Tr. 32].

While Zelin is correct that his February 21, 2011 and October 29, 2012 MRIs demonstrated the existence of several spine abnormalities, nothing in the record indicates that his treatment was altered to accommodate these findings. Furthermore, as the ALJ points out, Zelin's October 30, 2012 MRI indicated only "mild degenerative changes." [Tr. 28]. On January 10, 2013, records from City Medical include a diagnosis of lumbosacral retrolisthesis, lumbosacral spine degenerative joint disease, and right lower extremity pain, but there is no indication that Zelin's treatment was altered to accommodate these diagnoses. [15 at 6, Tr. 399]. Zelin's most recent MRI studies revealed no significant changes, further supporting the ALJ's conclusion. [Tr. 418-19].

As discussed above, *supra* at 10, if the Commissioner's decision is supported by substantial evidence, "it must be affirmed … even if substantial evidence also supports the opposite conclusion." *Cutlip*, 25 F.3d at 286. In light of the foregoing, the Court finds that the ALJ provided good reasons, supported by substantial evidence, for giving limited weight to Dr. Pinson's opinion.

2.      *The ALJ Did Not Err by Giving Different Weight to Different Portions of the Physicians' Reports*

Finally, Zelin argues that the ALJ erred by claiming to give substantial weight to the opinions of Dr. Morrow and Dr. Bray, while simultaneously discounting portions of those opinions as being inconsistent with the record.  [15 at 18-21].  Specifically, he argues that the ALJ "purported to give significant weight to the opinions of the consultative examiner, Dr. Bray, even while noting that the doctor did not accurately assess plaintiff's true condition [with regard to social functioning]" and that "the ALJ gave significant weight to the opinions of the nonexamining State agency consultant [Dr. Morrow] because it was consistent with the record and treatment history, only to indicate that this was not entirely so [with regard to social functioning]."  [*Id.* at 18-19].  Zelin concludes "[c]learly, the opinions of these two experts, particularly when discredited by the ALJ, is [sic] not sufficient to overcome the treating physician rule and permit the ALJ to disregard the opinions of Dr. Chapman."  [*Id.* at 19].  He makes similar assertions with regard to the ALJ's treatment of consultative physician Dr. Stephen E. Wood.  [*Id.* at 20-21].

Zelin's argument misses the mark.  An ALJ is not bound to either adopt or reject a physician's opinion in its entirety, but rather may accord differing weight to different portions of a medical opinion.  *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391-92 (6th Cir. 2004) (noting with approval an ALJ's decision to credit one portion of a physician's opinion while rejecting others); *see also Taylor v. Comm'r of Soc. Sec.*, No. 13-13288, 2015 WL 181656, at *6 (E.D. Mich. Jan. 14, 2015) ("There is no requirement that an ALJ must adopt [medical] opinions wholesale or not at all"); *Tomrell v. Comm'r of Soc. Sec.*, No. 10-14657, 2012 WL 959358, at *3 (E.D. Mich. Mar. 20, 2012) ("In the presence of substantial evidence that contradicts the treating physician's opinion, the ALJ may reject all or a portion of the treating source's findings,

22

provided the ALJ supplies 'good reasons' for doing so.").  The ALJ thus did not commit error by giving different weight to different portions of the various physicians' opinions.[8]

In sum, the ALJ gave good reasons for according lesser weight to the opinions of Dr. Chapman and Dr. Pinson, and did not commit error by giving differing weight to different portions of the state medical examiners' opinions.  The ALJ's decision is supported by substantial evidence and should be affirmed.

## III.    CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Zelin's Motion for Summary Judgment **[15]** be **DENIED**, the Commissioner's Motion **[17]** be **GRANTED**, and that this case be **AFFIRMED**.


Dated: June 4, 2015                                         s/David R. Grand
Ann Arbor, Michigan                                  DAVID R. GRAND
                                                                  United States Magistrate Judge


## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this

---

[8]  Moreover, the Court notes that by giving substantial weight to only a portion of Dr. Morrow and Dr. Bray's opinions, the ALJ actually found that Zelin was *more* impaired than those doctors suggested, thereby bolstering Zelin's claim of disability.

Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991);

*Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to

E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 4, 2015.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager