UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

T<small>IMOTHY</small> D<small>ANIEL</small> Z<small>ELIN</small>,

       Plaintiff,

v.

C<small>AROLYN</small> W. C<small>OLVIN</small>,
A<small>CTING</small> C<small>OMMISSIONER OF</small> S<small>OCIAL</small>
S<small>ECURITY</small>,

Defendant.
                                        /

Case No. 14-12845

S<small>ENIOR</small> U.S. D<small>ISTRICT</small> J<small>UDGE</small>
A<small>RTHUR</small> J. T<small>ARNOW</small>

U.S. M<small>AGISTRATE</small> J<small>UDGE</small>
D<small>AVID</small> R. G<small>RAND</small>

**O<small>RDER</small> A<small>DOPTING</small> R<small>EPORT AND</small> R<small>ECOMMENDATION</small> [19]; O<small>VERRULING</small>
P<small>LAINTIFF'S</small> O<small>BJECTIONS</small> [20]; G<small>RANTING</small> D<small>EFENDANT'S</small> M<small>OTION FOR</small>
S<small>UMMARY</small> J<small>UDGMENT</small> [17]; <small>AND</small> D<small>ENYING</small> P<small>LAINTIFF'S</small> M<small>OTION FOR</small> S<small>UMMARY</small>
J<small>UDGMENT</small> [15]**

Plaintiff seeks judicial review of an Administrative Law Judge (ALJ) decision denying her application for disability benefits. Plaintiff filed a Motion for Summary Judgment [Doc. #15] on November 26, 2014. Defendant filed a Motion for Summary Judgment [17] on January 26, 2015. On June 4, 2015, the Magistrate Judge issued a Report and Recommendation [19] recommending that the Court grant Defendant's motion and deny Plaintiff's. Plaintiff filed Objections to the Report and Recommendation [20] on June 17, 2015. Defendant filed a Response to Plaintiff's Objections [21] on June 19, 2015.

1

For the reasons stated below, the Court **ADOPTS** the Report and Recommendation [19]. Plaintiff's Objections to the Report and Recommendation [20] are **OVERRULED**. Defendant's Motion for Summary Judgment [17] is **GRANTED**. Plaintiff's Motion for Summary Judgment [15] is **DENIED**.

## FACTUAL BACKGROUND

Plaintiff applied for disability benefits on October 20, 2011, alleging that he became disabled on June 1, 2008. At the hearing before the ALJ, the disability onset date was amended to February 19, 2010.

The Magistrate Judge summarized the relevant medical evidence concerning Plaintiff's conditions as follows:

> [**Mental Health**]
> Zelin first sought mental health treatment from Community Care Services on November 15, 2011. [Tr. 295]. He asserted that he was seeking help for "anxiety and depression" because he felt that he did not have "any emotions left." [*Id.*]. He reported no thoughts of suicide, but had racing thoughts, pain which made sleep difficult, and low appetite. [*Id.*]. On December 12, 2011, Zelin complained to a consulting psychiatrist that he was "too stressed and worked up," had not slept for three nights, and said that he "heard inverted whispering voices of his brother." [Tr. 286]. A check box form completed on that date records that he was anxious and had hallucinations, but was cooperative, had good eye contact, and appropriate mood. [Tr. 289].
> The consulting psychiatrist prescribed Prozac and Seroquel to treat his sleep and anxiety issues. [Tr. 292].
>
> Zelin began treating with Dr. Chapman on January 12, 2012, at which point he reported "some improvement in symptoms," but continued to have anxiety. [Tr. 275]. On February 16, 2012, Dr. Chapman found that Zelin was "doing better with the medication,"

was "seeing a therapist monthly and feels it is going well," and had "[n]o perceptual disturbances." [Tr. 269]. His attitude was pleasant and cooperative, and his speech, mood, affect, perception, thought processes, and insight were found to be normal. [*Id.*]. On June 7, 2012, Dr. Chapman recorded that Zelin was "doing well" with his medications, his appetite and sleep had improved, and while he felt "depressed at times," he experienced no psychotic symptoms. [Tr. 382]. On August 2, 2012, Dr. Chapman recorded that Zelin's mood, affect, and other mental faculties were generally normal, and again found that Zelin was "doing well" with his medication, but suffered from chronic pain. [Tr. 372-73]. On September 27, 2012, Dr. Chapman again found generally normal mental health, with "no sign of perceptual disturbances." [Tr. 367].

On November 29, 2012, Dr. Chapman found that Zelin had "been relatively stable with med[ication]s for the past year and fe[lt] his children help[ed] him to stay calm." [Tr. 341]. However, Zelin reported being "more irritable and only sleeping 2-3 hours a day for the past few months," though Dr. Chapman noted that Zelin "did not mention it until today." [*Id.*]. Zelin also mentioned "finding himself closer to getting into altercations because of his irritability." [*Id.*].[1]

Consultative physicians Dr. Hugh Bray and Dr. Kathy Morrow also produced RFC assessments of Zelin's mental condition. Dr. Morrow found that Zelin was moderately limited in his ability to carry out detailed instructions, maintain concentration and attention for extended periods, and sustain an ordinary routine without special supervision. [Tr. 104]. She found that Zelin was not significantly limited in his ability to carry out very short and simple instructions, keep a schedule and be punctual, work in proximity to others, make simple work-related decisions, or complete a normal workday. [*Id.*]. She also found that Zelin did not have understanding or memory

---

[1] Dr. Chapman also noted that Zelin reported that he "stays down in the basement sitting in the darkness, and he heard inverted whispering voices of his brother…" [Tr. 341]. Given that the unique phrase "inverted whispering" first appears in notes from Zelin's December 12, 2011 visit, and because Dr. Chapman noted that Zelin was not experiencing hallucinations during his November 29, 2012 visit, this note appears to merely be a restatement of Zelin's earlier complaint. [Tr. 344].

3

limitations, social interaction limitations, adaptation limitations, or CPP limitations. [*Id.*].

Dr. Bray reached similar conclusions. He found that Zelin was mildly impaired in terms of his ability to relate to others, to understand, remember, and carry out tasks, and to maintain attention, CPP, and effort. [Tr. 312]. In terms of his ability to withstand stress and pressure in work activities, he found Zelin was mildly to moderately impaired. [*Id.*].

. . .

[**Physical Health**]

Notes [from City Medical] from September to November 2012 indicate a diagnosis of lumbosacral disc protrusion, anxiety, lumbosacral spine degenerative joint disease, and lumbosacral retrolisthesis. [Tr. 399-403]. Notes from December 2012 indicate a diagnosis of lumbosacral spine degenerative disc disease and anxiety. [Tr. 397]. Notes from January 2013 also include lumbosacral spine degenerative disc disease, anxiety, and right wrist pain. [Tr. 395].

. . .

On October 13, 2010, an x-ray of Zelin's lumbosacral spine showed "minimal dextroscoliosis," "disc space narrowing at the lumbosacral junction," a "small renal calculus," and "mild degenerative changes ... in sacroiliac joints on the left side." [Tr. 261]. On February 21, 2011, Dr. Gregory White performed an MRI scan on Zelin at Basha Diagnostics, P.C. [Tr. 259-60]. Dr. White found "no lumbar compression fracture, subluxation, suspicious bone marrow lesion or paraspinal mass. The distal cord and conus are normal. No abnormal cord enhancement." [Tr. 259]. Zelin's T12 through L5 vertebrae were found to be unremarkable, but his L4-L5 vertebrae showed "disc desiccation and decreased disc height" with "mild endplate spondylosis," "minimal facet arthrosis," "central disc protrusion . . . suggesting annular fissure," "mild spinal stenosis," and "mildly narrowed" neural foramina. [Tr. 259]. Dr. White's ultimate impression was of a "L4-L5 central disc protrusion with annular fissure." [*Id.*].

On September 8, 2011, Dr. Melicor interpreted an MRI of Zelin's spine, which he recorded was "grossly negative as seen," and was generally normal. [Tr. 258]. An MRI was again administered at Basha Diagnostics, P.C. on October 9, 2011, which Dr. Ruth Ramsey

4

found demonstrated a "small area of midline prominence of the disc at C5-6," with "otherwise normal" results and "no pathologic areas of enhancement." [Tr. 256].

On October 29, 2012, Dr. Brian Herman of Basha Diagnostics, P.C. interpreted yet another MRI of Zelin's spine, finding "normal variant transitional lumbosacral anatomy," "mild degenerative changes at the L4-L5 disc where there is disc desiccation," "mild loss of disc height," "a mild central disc bulge," a "posterior midline annular tear," "spinal canal stenosis and minor narrowing of the inferior aspects of bilateral neural foramina at L4-L5," with the other discs appearing generally normal. [Tr. 320-21].

Dr. Ramsey again interpreted an MRI of Zelin's spine on April 10, 2013, which she found displayed "a small, focal, midline herniated disc at C5-C6," but with no other "appreciable change[s]" when compared to Zelin's October 9, 2011, study. [Tr. 418-19].

The Magistrate Judge summarized Plaintiff's own statements and testimony concerning his conditions as follows:

> In an undated disability report, Zelin asserted that the conditions rendering him disabled were as follows: back injury, scoliosis, arthritis of the spine, split disc in lower spine, arthritis, nerve damage, depression, severe anxiety, fatigue, memory loss, and a history of head injuries. [Tr. 213]. Prior to stopping work, Zelin worked as a laborer, Navy Seaman Apprentice, and driller. [Tr. 105]. Zelin was 30 years old as of his amended alleged onset date. [Tr. 82].
> 
> Zelin completed a function report dated November 30, 2011. [Tr. 204-211]. In that report, he complained of "tingling and numbness down my legs" and "severe pain in my lower spine" such that he is required to "lie down throughout the day." [Tr. 204]. He reported discomfort "much of the time" that "affects my concentration and ability to think." [*Id.*]. He also reported experiencing fatigue, memory loss, and depression, which he attributed to several car accidents and head injuries. [*Id.*].
> 
> With regard to his activities of daily living, Zelin stated that he has trouble sleeping and is consequently too fatigued to engage in many activities. [Tr. 205]. While he assists in taking care of his

5

children, Zelin stated that he is "not able to [do] any chores completely or to the level that I was able to before . . . . It is difficult to bend, lift, move around like I used to." [Tr. 204, 206]. He stated that "for the most part, I stay inside and isolate myself," and that he "lost interest in a lot of things because of my depression." [Tr. 207-08].

Zelin reported that he drives or rides in a car when going out, and is able to go out alone. [Tr. 207]. However, he indicated that driving is sometimes painful because of "[t]ingling and numbness down my legs from the nerve damage," and drives "when I absolutely have to and have no one to take me." [*Id*.]. Zelin also stated that he is able to manage his monetary affairs, but "because of my memory difficulties, I will sometimes lose track of bills, lose track of things I need to do to manage money." [*Id*.].

Regarding self-care, Zelin noted difficulty getting dressed and using the toilet because of back and knee pain. [*Id*.]. He also reported that he requires reminders to take care of personal grooming "sometimes," and generally requires reminders to take his medicine or go places. [Tr. 206, 208]. He reported cooking only simple meals because his pain makes it "very difficult to stand for even ten minutes at a time just to make food," and stated that he takes breaks to lie down while cooking. [*Id*.].

Regarding his social interactions, Zelin reported that he mostly interacts with his children, "tend[s] to isolate" himself, and rarely socializes outside of his family. [Tr. 208]. Zelin asserted that he does not regularly go outside except for doctor's appointments. [*Id*.]. Zelin noted that he is "not as social or happy" as he once was, but did not have "big problems" getting along with others. [Tr. 209]. He also reported difficulty handling stress and "high anxiety," along with experiencing "paranoia and panic attacks more than I used to." [Tr. 210].

Zelin reported that his injuries negatively impacted his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb, complete tasks, memorize, concentrate, and understand, but did not impact his ability to use his hands, follow instructions, or get along with others. [Tr. 209].

At the February 22, 2013 hearing before the ALJ, Zelin testified that while working as a driller, he regularly lifted weights greater than

6

100 pounds. [Tr. 48]. During his work as a laborer, Zelin regularly lifted shovels full of dirt and bags of dirt. [Tr. 49].

Zelin testified that he suffers from disabling pain in his lower and upper back, arthritic pain in his right hand, and pain and numbness in his right thigh. [Tr. 51-52]. He recounted taking the anti-inflammatory drug Naproxen, Neurontin for nerve damage, Vicodin for pain, Klonopin and Prozac to treat anxiety, and Seroquel to assist in sleeping. [Tr. 54-55]. Zelin stated that his pain medication "did not cure everything" but made his leg pain "a little more bearable." [Tr. 55]. He testified that physical therapy provided good results, but complained of neck and lower back pain from certain exercises. [Tr. 56-57].

Zelin testified that he could walk about a block before knee pain forced him to stop, and could sit for approximately 30 to 60 minutes before his back pain causes him to change position. [Tr. 60]. He said he was most comfortable lying flat on carpet with his knees in the air, which he does two or three times daily. [Tr. 70]. Zelin wrote that he could pour a gallon of milk with his left hand, but would experience pain if he attempted to do so with his right hand. [Tr. 61]. However, he retained the ability to open doorknobs with his right hand. [Tr. 72]. He also stated that he could lift a 20 pound sack if he could support himself properly, but could not repeatedly lift such weight. [Tr. 61]. He testified that he experienced some difficulty in lifting up his five year old son. [Tr. 72]. Zelin said he is able to care for himself, cook simple meals, and do laundry. [Tr. 63]. He also recounted that he is able to go shopping, but rides a scooter for long shopping trips. [Tr. 63-64].

Zelin testified about memory and concentration problems, including problems "trying to control what I'm thinking about." [Tr. 69]. With regard to social interactions, Zelin recounted getting along well "with the few people I know," but said that interacting with unfamiliar persons "scares me because, I don't – you know, again, the self-control, I don't know what . . . could happen." [Tr. 62]. He said he experiences irritability and racing thoughts as a result of pain. [*Id*.]. Zelin described his depression as manifesting in feelings of being "worthless," and reported spending an excessive amount of time in his basement "isolating myself like a hermit," where he does little but play solitaire. [Tr. 67-68]. Zelin stated that he has "heard voices"

7

speaking to him, and occasionally believes that his children are calling for him when they are in fact asleep, though he characterized this experience as "nothing delusional." [Tr. 68]. He also recounted hearing his deceased brother's voice after staying awake for three days, and stated that the loss of his brother in 2006 "bothers me a lot still to this day." [Tr. 68-69]. Zelin said he gets approximately four hours of uninterrupted sleep nightly when taking Seroquel. [Tr. 69]. With regard to substance use, Zelin stated that he abstained from alcohol for "almost a year" as of the hearing, but occasionally used marijuana. [Tr. 57-58].

On March 14, 2013, the ALJ denied Plaintiff's application for disability benefits, finding that Zelin was not disabled. On July 21, 2014, Plaintiff filed the instant suit for judicial review of the ALJ's decision.

## STANDARD OF REVIEW

The Court reviews objections to a Magistrate Judge's Report and Recommendation on a dispositive motion *de novo*. *See* 28 U.S.C. §636(b)(1)(c).

Judicial review of a decision by a Social Security ALJ is limited to determining whether the factual findings are supported by substantial evidence and whether the ALJ employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The ALJ's factual findings "are conclusive if supported by substantial evidence." *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 243 (6th Cir. 1987). "Substantial evidence is defined as more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc.*

8

*Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  The substantial evidence standard "does not permit a selective reading of the record," as the reviewing court's assessment of the evidence supporting the ALJ's findings "must take into account whatever in the record fairly detracts from its weight."  *McLean v. Comm'r of Soc. Sec.*, 360 F. Supp. 2d 864, 869 (E.D. Mich. 2005) (quoting *Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir. 1984)).  However, so long as the ALJ's conclusion is supported by substantial evidence, a court must "defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

## ANALYSIS

Plaintiff raises two objections to the Report and Recommendation.  Plaintiff first argues that the Magistrate Judge "improperly excused the ALJ's failure to accord the opinions of Plaintiff's treating psychiatrist, Dr. Chapman, controlling weight in accordance with the treating physician rule."  Plaintiff then raises the same argument with respect the opinions of Plaintiff's treating physician, Dr. Pinson.

As a threshold matter, Plaintiff has erred by relying on the "treating physician rule" to argue that the capacity assessments completed by Drs. Chapman

9

and Pinson are entitled to controlling weight. A treating source's "medical source statement," or "statement about what you can still do despite your impairment(s)" as defined in 20 C.F.R. § 416.913, "may be entitled to controlling weight on issues concerning the nature and severity of an individual's impairment(s)." Soc. Sec. Ruling 96-5p, 61 FR 34471-01, 34473 (July 2, 1996). However, such a medical source statement "is an opinion submitted by a medical source *as part of a medical report*." *Id.* (emphasis added); *see also* 20 C.F.R. § 416.913(b). A medical report should also include medical history, clinical findings, laboratory findings, diagnosis, and treatment information. 20 C.F.R. § 416.913(b).

The capacity assessments submitted by Drs. Chapman and Pinson include none of these things. Instead, the assessments consist only of the doctors' responses to prompts corresponding to certain limitations, with no reference to medical information. Thus, rather than medical source statements as defined by the regulations, the Court considers the assessments to be opinions on Plaintiff's residual functional capacity. Regardless of their source, opinions on a claimant's RFC are never entitled to controlling weight or special significance. 20 C.F.R. § 416.927(d)(3); Soc. Sec. Ruling 96-5p, 61 FR at 34472. In other words, the "treating physician rule" does not apply.

10

The ALJ may nevertheless have erred in his consideration of the doctors' assessments. An ALJ may not ignore a medical source's opinion on a claimant's RFC; if the record contains such an opinion, the ALJ "must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." Soc. Sec. Ruling 96-5p, 61 FR at 34472. As explained below, Plaintiff has not shown that the ALJ failed to properly carry out this duty. Accordingly, Plaintiff's objections are overruled.

**I.      Dr. Chapman**

Dr. Chapman completed a "mental residual functional capacity assessment." In addition to identifying several "moderate" limitations, he opined that Plaintiff is "markedly" limited in the ability to understand, remember, and carry out detailed instructions; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to set realistic goals or make plans independently of others.

The ALJ gave Dr. Chapman's assessment limited weight. Nevertheless, the ALJ's RFC finding incorporated limitations related to Plaintiff's impaired capacity

11

for following instructions and interacting with others: the ALJ limited Plaintiff to work that requires no interaction with the public; only occasional interaction with supervisors and coworkers, with no tandem tasks; only simple work-related decisions; only simple, routine, repetitive unskilled tasks; no fast-paced production requirements; and few, if any, work place changes. The vocational expert had testified that these limitations would not preclude Plaintiff from competitive work.

The ALJ most notably departed from Dr. Chapman's assessment by omitting any limitation corresponding to a marked limitation in the ability "to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." It is possible that the inclusion of such a limitation would have changed the vocational expert's opinion on Plaintiff's capacity for competitive work.

Plaintiff, however, points to no evidence (other than Dr. Chapman's assessment itself) that specifically supports the inclusion of such a limitation in his RFC. Plaintiff only argues that the ALJ underestimated the extent to which Dr. Chapman's treatment notes reflect Plaintiff's poor mental health. Specifically, Plaintiff argues that the ALJ misinterpreted the treatment notes by (1) interpreting references to "stability" as references to the limited severity of Plaintiff's

symptoms, rather than their constancy; (2) relying on the results of a November 2012 examination to give Dr. Chapman's assessment limited weight, even though Plaintiff reported some worsening symptoms at the time of that examination; and (3) reasoning that Dr. Chapman's finding of a GAF score of 51 supported more moderate limitations than those in his assessment, even though that GAF score relied on symptom-reducing strategies Plaintiff used that would be unavailable if he returned to work.

It is not this Court's place to examine, in isolation, each piece of evidence mentioned by the ALJ, determine that the ALJ could have weighed it differently, and reverse the ALJ on that basis. Under the substantial evidence standard, it is Plaintiff's burden to show that a reasonable mind, viewing the evidence as a whole, could not accept the ALJ's factual conclusion. *See Rogers*, 486 F.3d at 241. The ALJ included significant limitations in Plaintiff's RFC attributable to his mental impairments. Plaintiff has not explained how his favored interpretation of the selected evidence would render a reasonable mind unwilling to accept the omission of additional, work-preclusive limitations from Plaintiff's RFC.

In sum, Plaintiff has not shown that the ALJ failed to properly consider Dr. Chapman's opinion on Plaintiff's RFC.

**II.     Dr. Pinson**

Dr. Pinson completed a "physical capacities evaluation medical assessment." Dr. Pinson opined that "on a sustained basis," Plaintiff can sit less than two hours in an eight-hour workday and stand or walk less than one hour. He further opined that Plaintiff cannot use his feet to operate leg controls on a sustained basis. Finally, he opined that if Plaintiff returned to work with a sit-stand option, he would require five-to-ten-minute rest periods per hour.

The ALJ found that the medical evidence did not support limitations as restrictive as Dr. Pinson had found, "particularly with regard to sitting, standing/walking, operation of foot controls, or the need for a ten-minute rest per hour." The ALJ suggested that Dr. Pinson's assessment was inconsistent with the findings of the October 2012 MRI, which revealed only mild degenerative changes at L4-L5 with a mild central disc bulge and minimal grade I retrolisthesis of L4 on L5. Further, the ALJ implied that Dr. Pinson did not truly believe Plaintiff's limitations were so severe, since he had pursued only conservative treatment with little or no significant adjustments over time.

The ALJ nevertheless incorporated some limitations regarding sitting, standing, and walking into Plaintiff's RFC: the ALJ found that Plaintiff can sit only six hours in an eight-hour workday, can stand or walk only for six hours as

well, and needs a sit/stand option every thirty minutes, provided Plaintiff is not off task more than ten percent of the workday. The vocational expert had testified that these limitations would not preclude Plaintiff from competitive work. On the other hand, the vocational expert testified that Plaintiff would be precluded from competitive work if, in addition to the limitations in his RFC, he would require frequent position changes, would suffer from the distracting effects of pain, would be sleepy at least part of the workday due to the side effects of medication, and would be expected to be off task twenty percent of the workday due to the need for unscheduled breaks. These additional limitations appear designed, at least in part, to reflect additional limitations identified by Dr. Pinson.

Plaintiff does not persuasively show that the ALJ was required to include these additional limitations in his RFC. To support their inclusion, Plaintiff points to three pieces of medical evidence: (1) MRI results from May 2011 indicative of degenerative disc disease, disc dessication, facet arthrosis, and central disc protrusion with an annular fissure at L4-L5; (2) treatment notes from November 30, 2010, indicating positive results from straight leg-raising tests; and (3) Plaintiff's subscriptions for "very significant narcotic medications." Plaintiff does not, however, challenge the ALJ's assessment of Dr. Pinson's treatment as conservative. Nor does Plaintiff explain why the MRI results and treatment notes

he relies on deserve more weight than the *subsequent* MRI results relied upon by the ALJ. Plaintiff cannot demonstrate that the ALJ's findings are unsupported by substantial evidence simply by pointing to isolated evidence in the record supporting different findings. *See Longworth*, 402 F.3d at 595.

In sum, Plaintiff has failed to demonstrate that the ALJ improperly evaluated Dr. Pinson's opinion on his RFC.

## CONCLUSION

For the reasons stated above,

**IT IS ORDERED** that the Report and Recommendation [19] is **ADOPTED** and entered as the findings and conclusions of the Court. Plaintiff's Objections to the Report and Recommendation [20] are **OVERRULED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment [17] is **GRANTED**. Plaintiff's Motion for Summary Judgment [15] is **DENIED**.

**SO ORDERED**.

                                                               s/Arthur J. Tarnow
                                                               Arthur J. Tarnow
Dated: September 11, 2015              Senior United States District Judge